

U.S. Department of Justice

United States Attorney
Eastern District of New York

NB:AXB/JRS
F. #2020R00569

610 Federal Plaza
Central Islip, New York 11722

October 4, 2023

By ECF

The Honorable Gary R. Brown
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Rickey Lynch
                  Criminal Docket No. 21-405 (S-1) (GRB)

Dear Judge Brown:

       The government respectfully submits this letter in opposition to the portion of defendant Rickey Lynch's September 28, 2023 motion that seeks to withdraw his guilty plea. (ECF:68.) For the reasons that follow, that relief should be denied, and this matter should proceed to sentencing as scheduled.

       I.    Background

          A.    The Class-Action Lawsuit and the Court's Judicial Elevation

       On May 27, 2011, Lynch commenced a pro se lawsuit against then-Suffolk County Sherriff Vincent F. DeMarco and others, challenging the conditions of his confinement at a Long Island correctional facility. See generally, Butler, et al. v. Suffolk County, et al., No. 11-CV-2602 (JS).[1] The case was initially assigned to United States District Judge Joanna Seybert and United States Magistrate Judge Arlene R. Lindsay.

       On October 24, 2011, then-Chief United States District Judge Carol B. Amon issued Administrative Order 2011-13 appointing Your Honor as a United States Magistrate Judge for the Eastern District of New York. See Exhibit A hereto (Admin. Order 2011-13).

---

[1] In a Memorandum & Order entered on March 19, 2013, Judge Seybert certified Lynch's lawsuit as a class action, appointed class counsel, and designated Lynch as the class representative for a subclass of plaintiffs incarcerated at the Yaphank jail. (ECF:375.)

As is customary when a new Magistrate Judge ascends to the bench, some number of existing cases was reassigned to Your Honor. Thus, as reflected in an electronic order entered on November 21, 2011, Lynch's lawsuit was reassigned from Judge Lindsay to Your Honor. Judge Seybert remained the presiding district judge.

On or about July 30, 2015, the President of the United States nominated Your Honor to be a United States District Judge for the Eastern District of New York.[2] On or about April 8, 2019, after the 114th Congress adjourned without taking up the Court's nomination, the successive President announced his intention to renominate Your Honor to the same position.[3] On or about December 19, 2019, following a favorable report by the Senate Judiciary Committee, the full Senate confirmed Your Honor to his current position as an Article III judge.[4] On December 31, 2019, Your Honor received his judicial commission.[5]

Throughout the nearly five-year period between Your Honor's initial nomination and eventual confirmation, the Court served as the assigned magistrate judge on Lynch's civil lawsuit. Following Your Honor's confirmation, however, some number of cases previously assigned to other district judges was now reassigned to Your Honor. Likewise, since Your Honor was no longer a magistrate judge, all the cases to which Your Honor had previously been assigned—including Lynch's civil lawsuit—were reassigned to other magistrate judges.

That mass reassignment evidently occurred on January 21, 2020, approximately 21 days after Your Honor received his judicial commission. Indeed, publicly available records reflect that at least 156 cases—including Lynch's—were all reassigned away from Your Honor on January 21, 2020. See Exhibit B (compiled docket entries from PACER).[6]

---

[2] See Press Release, The White House, President Obama Nominates Seven to Serve on the United States District Courts (July 30, 2015), available at https://obamawhitehouse.archives.gov/the-press-office/2015/07/30/president-obama-nominates-seven-serve-united-states-district-courts (last accessed October 2, 2023).

[3] See Press Release, The White House, President Donald J. Trump Announces Judicial Nominations (April 8, 2019), available at https://trumpwhitehouse.archives.gov/presidential-actions/president-donald-j-trump-announces-judicial-nominations/ (last accessed October 2, 2023).

[4] See PN773 – Gary Richard Brown – The Judiciary, available at https://congress.gov/nomination/116th-congress/773 (last accessed October 2, 2023).

[5] See Gary Richard Brown, Federal Judicial Center, available at https://www.fjc.gov/history/judges/brown-gary-richard (last accessed October 2, 2023).

[6] This information is available to accountholders on the Eastern District of New York's official court electronic document filing system, commonly referred to as "ECF."

B. <u>The Instant Prosecution</u>

On August 5, 2021, approximately one-and-a-half years after the Court's last involvement with Lynch's civil lawsuit, a grand jury in the Eastern District of New York returned a three-count indictment charging Lynch with violating the Toxic Substances Control Act of 1976 ("TSCA"), making false statements to the Environmental Protection Agency ("EPA") and aggravated identity theft. (ECF:1.) Those charges stemmed from Lynch's performance of lead-based paint abatement work at a house in Freeport. Lynch's arrest warrant was signed by United States Magistrate Judge Steven I. Locke and the case was randomly assigned to Your Honor.

Between August 6, 2021, when the indictment was unsealed, and July 12, 2023, Lynch's criminal case proceeded in the ordinary course before this Court, with both sides seeking rulings on various dispositive and non-dispositive pretrial matters. On August 2, 2022, for example, Lynch filed with the Court an omnibus motion for partial dismissal of the indictment and other relief. (ECF:23.) On June 2, 2023, the government filed motions <u>in limine</u> seeking, <u>inter alia</u>, to introduce at trial evidence of Lynch's prior convictions.[7] (ECF:38.) And on July 9, 2023, Lynch filed motions <u>in limine</u> of his own. (ECF:58.) Throughout the same time period, the Court presided over numerous courtroom proceedings, including oral arguments on the above-described motions, substantially all of which were personally attended by Lynch. <u>See, e.g.</u>, Exhibit C hereto (Transcript of Proceedings held on June 22, 2023) at 2 (noting that "Mr. Lynch has shown up more than any defendant I've ever seen. He's been here on days when no one else was here," to which Lynch replied, "Thank you, Your Honor."). Yet, in none of his pretrial submissions or oral presentations to the Court did Lynch or his counsel ever suggest that the Court was biased or unable to fairly and impartially preside over this case. Nor did Lynch or his counsel ever request that the Court recuse itself for any reason.

Thus, on July 10, 2023, the Court presided over jury selection and the start of witness testimony in Lynch's criminal trial. (ECF:60.) By July 12, however, the parties informed the Court that a negotiated disposition had been reached. As observed in a September 24, 2023, letter from Lynch's lead trial counsel Howard Greenberg, Esq., this was the rare case in which, "[a]fter the jury was sworn in and after the start of testimony, the parties continued to engage in plea negotiations which begat a result." (ECF:67.)

---

[7] Notably, the Court rejected the government's effort in this regard, finding that the government failed to sufficiently establish a non-propensity basis for admitting evidence of Lynch's priors and, in any event, that the probative value of his criminal history outweighed its prejudicial effect. (Electronic Order dated July 5, 2023.)

C. <u>Lynch's Guilty Plea</u>

As Mr. Greenberg noted, following mid-trial discussions, Lynch informed his attorneys that "he would plead guilty to lying to a federal agent," as alleged in Count Six of the superseding indictment. (ECF:67.) A written plea agreement was executed.[8]

The Court asked the government to outline for the record the plea agreement between the parties, which the prosecutor did. (Tr.[9] 114:6-116:4.) Then, after being sworn, Lynch answered numerous questions related to his decision to plead guilty. (Tr. 117:1-9.) In particular, Lynch confirmed under oath that he had not recently been under the care of a physician or a psychiatrist, except in connection with an unspecified kidney issue. (Tr. 117:19-22.) He stated he was not taking any medications that would affect his ability to understand the proceedings. (Tr. 117:23-118:3.) And he confirmed that he had not, in the past 24 hours, ingested any narcotics, drugs, medicine, pills or alcohol; that his mind was clear. (Tr. 118:7-13.)

Lynch stated that he understood his right to plead not guilty and persist in that plea. (Tr. 119:8-12.) He stated that he understood his right to a speedy and public trial by jury with the assistance of counsel. (Tr. 119:13-17.) He stated that he understood that he would be presumed to be innocent and that the government would have to prove his guilt by competent evidence beyond a reasonable doubt. (Tr. 119:18-120:1.) He stated that he understood that the government's witnesses would have to testify in his presence and could be cross-examined by his attorneys; that defense counsel could object to the government's evidence, offer evidence on his behalf, and compel witnesses of their own to testify in court. (Tr. 120:2-14.) Lynch stated that he understood his right to testify, as well as the Constitution's prohibition against compelled self-incrimination. (Tr. 120:15-21.) Lynch stated that he wished to waive those rights, understanding that:

> If you plead guilty, and I accept that plea, you will be giving up your constitutional right to a trial and the other rights I outlined. The trial would end. There would be nothing further, no further trial of any kind, and no right to appeal or collaterally attack the question of whether you are guilty or not. A judgment of guilty will be entered on the basis of your guilty plea, and that judgment could never be challenged . . .

(Tr. 120:23-121:5.)

With respect to the plea agreement, the prosecutor noted that the government "had a chance to sit down with Mr. Greenberg and Mr. Lynch and we went through the

---

[8] A copy of the fully executed Plea Agreement is attached hereto as Exhibit D.

[9] "Tr." refers to the transcript of proceedings held on July 12, 2023, a copy of which is attached hereto as Exhibit E.

4

agreement." (Tr. 122:6-8.) The Court confirmed that Lynch discussed the sentencing guidelines with his attorneys, that he understood the Guidelines calculation set forth in the plea agreement was simply an estimate, and that the Guidelines are not binding on the Court in any event. (Tr. 125:17-126:3.) Lynch stated he understood that if his eventual sentence is more severe than he had hoped or expected, he would not be able to withdraw his plea. (Tr. 126:22-127:1.)

After agreeing that he had been satisfied with the representation provided by his then-attorneys, Lynch entered a guilty plea to Count Six of the superseding indictment. (Tr. 127:7-24.) In that regard, Lynch stated that he made his plea voluntarily and of his own free will. (Tr. 127:25-128:2.) He denied that anyone had threatened him or forced him to do so. (Tr. 128:3-5.) He denied that anyone had made him promises that were not contained in the written plea agreement. (Tr. 128:6-9.) He denied that anyone had made him promises about what his eventual sentence will be. (Tr. 128:10-12.) He then offered the following factual recitation of the conduct that made him guilty:

> THE DEFENDANT: I was working on a worksite that day, January 8th [2020]. I previously had a certification [to supervise lead-based paint abatement activities]. It had expired, and I misrepresented to the EPA agent, both orally and in writing, that my supervisor was present when I did the job, but that was not true. So that was a false statement.
>
> THE COURT: The false statement was that your supervisor was on-site when that was not true.
>
> THE DEFENDANT: That's not true.
>
> THE COURT: Okay.

(Tr. 128:23-130:22.)

Based on Lynch's allocution, the Court found that he was acting voluntarily and fully understood his rights and the consequences of his plea. (Tr. 130:24-131:1.) The Court also found that there was a factual basis for the plea and, as such, accepted it. (Tr. 131:131-3.) The Court then dismissed the jury and continued the matter for sentencing. (Tr. 135:8-136:4.)

II. The Instant Motion

On July 31, 2023, new counsel Samantha Chorny, Esq., appeared in this matter on Lynch's behalf. (ECF:63.) On September 19, 2023, acting through new counsel, Lynch filed a motion (the "First Motion") to withdraw his guilty plea and have the Court recuse itself from further proceedings. (ECF:64.) According to the First Motion, the two forms of relief were interrelated, as Lynch alleged the Court had reason to be biased against him and, had he

5

previously been aware of such bias, he would not have pled guilty.  See, e.g., 1st Mot. 1 (asserting that "due to the subsequent revelations regarding Judge Brown's potential biases and prior involvements, Mr. Lynch's plea may have been influenced be external factors, negating the voluntary nature of his decision.").

The sources of the Court's alleged bias were described in the First Motion as: (i) his time as the magistrate judge assigned to Lynch's civil lawsuit, through which he "was privy to intricate details of Mr. Lynch's personal life"; (ii) his upbringing in Suffolk County and service as an AUSA, through which he developed "loyalties to the County and its officials [that] may hinder his ability to deliver an unbiased verdict"; and (iii) his "deep aversion to false reporting," as evidenced by judicial rulings he made in connection to civil litigation arising from Superstorm Sandy.  (1st Mot. 2.)   The centerpiece of Lynch's argument was his assertion that "[i]n January 2021, Judge Brown chose to recuse himself" from Lynch's civil lawsuit "on the very day that the EPA initiated its federal criminal investigation against" him. (Id. at 3.)  In a rather stunning accusation, Lynch alleged that the Court's failure to disclose these "substantial past interactions with Mr. Lynch and his pronounced stance on related issues signals a potential breach of [an] ethical obligation."  (Id. at 2-3.)

In a Memorandum of Decision and Order entered on September 20, 2023, the Court deemed Lynch's filing withdrawn due to questions over the validity of Lynch's attempt to substitute Ms. Chorny for his trial counsel. (ECF:65.)  In addition, having expressed serious concerns about the merits of Ms. Chorny's filing, the Court ordered the parties to appear for a conference on September 27, 2023.[10]

During that conference, the Court inquired of Ms. Chorny about the nature of the investigation she had conducted in relation to her claims of bias, noting that the Court's involvement in Lynch's civil lawsuit was not withheld from the parties; the identity of the assigned magistrate judge is a matter of public record, and as a class representative, Lynch himself was in a position to know of the Court's involvement in his case.  The Court further noted that, contrary to Ms. Chorny's claims, the public docket in Lynch's civil lawsuit does not reflect any recusal by the Court but rather a reassignment upon the judge's elevation.  The Court probed other claims too, asking, for example, why his alleged ties to Suffolk County warranted recusal in this case given that Lynch's conduct occurred in Nassau County.

The Court arranged for an independent defense attorney from the Federal Defenders of New York, Inc. to consult with Lynch about his substituted counsel and the motion she filed, but Lynch declined.  The Court also recessed to allow Lynch to decide, after conferring with counsel, whether he wished to proceed with the motion; when counsel indicated that Lynch needed more time to consider his options, the Court obliged.

On September 28, 2023, through Ms. Chorny, Lynch re-filed a substantially similar version of the motion (the "Second Motion"), again arguing that the Court's bias

---

[10] A copy of the transcript of proceedings held on September 27, 2023 is attached as hereto as Exhibit F.

6

provides a basis for Lynch to withdraw his guilty plea and that the Court should recuse itself from further proceedings. (ECF:68.)

      III.    Argument

        A.  Standard of Review

Under Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure, a defendant may withdraw his guilty plea if he shows "a fair and just reason" for doing so. Although the wording of the rule implies that motions to withdraw should be liberally granted, "[t]he standard for withdrawing a guilty plea is stringent because 'society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice.'" United States v. Schmidt, 373 F.3d 100, 103 (2d Cir. 2004) (quoting United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997)).

Thus, the mere fact "that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea." United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992). Rather, courts apply a three-factor analysis to determine whether the defendant has carried his burden of establishing valid grounds for withdrawal, to wit: (i) whether the defendant has asserted his legal innocence; (ii) the amount of time that has elapsed between the plea and the motion; and (iii) whether the government would be prejudiced by a withdrawal of the plea.[11] See United States v. Rosen, 409 F.3d 535, 546 (2d Cir. 2005) (quoting Schmidt, 373 F.3d at 102-03). The Court may also consider whether the defendant has raised a significant concern about the voluntariness of the plea. See id. (quoting United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997)). Evaluation of these factors is committed to the trial court's discretion. See id.

        B.  Application

Applying the standards outlined above, it is clear that Lynch's motion fails to identify a legally sufficient reason to withdraw his guilty plea. First, Lynch has not asserted his innocence. Rather, at the time of his plea, Lynch provided a sworn factual recitation of the conduct that made him guilty of Count Six, which has not been retracted. To be sure, the instant motion is based exclusively on allegations of the Court's bias, not actual innocence. Second, Lynch waited more than two months to attempt to withdraw his plea—a gap that militates against the relief he seeks. In Rosen, for example, the Second Circuit affirmed a district judge's denial of a motion to withdraw a guilty plea where four months had elapsed, finding that:

---

[11] Although the Court may consider prejudice to the government, the government has no burden to establish prejudice where the defendant's reasons for withdrawal do not independently satisfy the Court. See Gonzalez, 970 F.2d at 1100.

7

> Such a strategic maneuver is plainly contrary to the rationale for plea withdrawal, which is to permit [a defendant] to undo a plea that was unknowingly made at the time it was entered, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.

409 F.3d at 547.

Third, there is no serious suggestion that Lynch's plea was not voluntary. As outlined above, Lynch unequivocally stated under oath that his decision was voluntary and of his own free will, and that no one had threatened or forced him to change his plea.[12]

Lastly, granting Lynch's motion would substantially prejudice the government since his decision to plead guilty prematurely terminated a jury trial. As the Court is aware, the government expended significant time and resources on the preparation of its case-in-chief, including, but not limited to, the preparation and production of voluminous trial exhibits and other pretrial disclosures, and travel and scheduling arrangements for approximately two dozen witnesses. The Court likewise summoned more than 100 prospective jurors to the courthouse for jury selection, presided over the selection of a suitable jury, promptly ruled on pretrial motions, and crafted complex jury instructions for a nine-count superseding indictment. All of those efforts were set aside in reliance on Lynch's decision to plead guilty. The prejudice in allowing him to now abandon that decision is self-evident.

The allegations of bias raised in support of Lynch's motion are unfounded and do not present a cognizable basis for the relief he seeks. In that regard, Lynch claims that the Court has an undisclosed association with the EPA. That association was assertedly developed through the Court's tenure as an AUSA, where Lynch claims the Court had "extensive engagements on [EPA] related cases" (2d Mot. 1); "prosecut[ed] numerous cases concerning EPA matters" (Id. at 2); and was "a notable figure in enforcing environmental regulations and compliance" (Id. at 8). But the motion fails to identify a single case that the Court handled as an AUSA that would demonstrate any supposed association with that agency, let alone one that would continue to influence the Court nearly 20 years after Your Honor left the U.S. Attorney's Office. And even if it had, the Court's alleged experience as a prosecutor handling environmental cases (if it exists) would not, by itself, be a basis for withdrawing a guilty plea.

Lynch also implies that the Court has some affinity for the EPA because, as a magistrate judge, he ruled that insurance companies may have fabricated engineering reports in the wake of Superstorm Sandy. (2d Mot. 8.) Lynch does not allege that the EPA was involved in that matter. Instead, he claims that the Superstorm Sandy cases "bear[ ] a striking

---

[12] In the First Motion, Lynch made a single, conclusory reference to the voluntariness of his plea, suggesting that his decision "may have been influenced by external factors, negating the voluntary nature of his decision." (1st Mot. 1.) But this equivocal reference appears to have been deleted from the Second Motion.

8

resemblance to the foundational claims of environmental neglect and misconduct" with which he was charged here. (Id. at 6.) But there is no credible comparison. The Court's prior involvement in a civil dispute involving storm damage cannot reasonably be connected to the allegations against Lynch, which arose from lead-based paint abatement work performed almost a decade later. More fundamentally, though, the Court's involvement in the Superstorm Sandy cases is a matter of public record, which was readily ascertainable by Lynch at any time prior to his plea. Indeed, in support of his claim, Lynch cites to a press release issued by the office of Senator Chuck Schumer on June 19, 2015—approximately six years before his criminal case was commenced. There is no plausible basis for Lynch's suggestion that he was "ke[pt] . . . in the dark" about those circumstances. (Id. at 3.)

As noted above, the proverbial "smoking gun" in Lynch's motion is the notion that the Court recused itself from Lynch's civil lawsuit at or around the same time that the EPA opened an investigation into him. In fact, in the Second Motion, Lynch suggests the Court was reassigned from his civil lawsuit to his criminal case, the implication being that the move was deliberate. See, e.g., 2d Mot. 3 (alleging "questionable circumstances surrounding Judge Brown's re-assignment to [Lynch's] criminal case") (emphasis added). Indeed, throughout his motion, Lynch repeatedly intimates that the Court's reassignment was improper. See, e.g., id. at 9 (alleging that the reassignment "is indeed an uncanny coincidence that raises substantial concerns regarding the impartiality and the knowledge base of Judge Brown"); id. at 9-10 (suggesting that the reassignment "is a significant cause for concern"); id. at 10 (describing the Court's allegedly "unusual re-assignment").

As described above, however, this argument is long on innuendo and short on facts. The record is clear that Lynch's civil lawsuit was initially assigned to Magistrate Judge Lindsay; when Your Honor was appointed to be a magistrate judge, the lawsuit was reassigned to him; and when Your Honor was later elevated to a different position, the lawsuit was reassigned to United States Magistrate Judge Steven Tiscione, who continues to preside (with Judge Seybert) today. There is nothing "questionable" about any of this, particularly when one considers that Lynch's civil lawsuit was one of 156 cases reassigned on the same day.

Despite his accusations of impropriety, Lynch does not explain how the Court might have gained knowledge of the supposed commencement of an EPA investigation into lead-based paint abatement approximately eight months before any charges were unsealed. Nor, for that matter, does Lynch specify the factual basis for his assertion that the EPA's investigation was commenced on January 21, 2021. See, e.g., 2d Mot. 2 (asserting that Lynch's lawsuit was reassigned "on the very day the EPA initiated a federal criminal investigation into the Defendant's case"). Previously, in his August 22, 2022 motion to dismiss, Lynch specifically disputed that the EPA's investigation began in January 2021 and wrote that "[i]n and around February of 2020 . . . the EPA turned tables and started investigating Mr. Lynch." (ECF:23.)

Nevertheless, Lynch claims that as a result of Your Honor's involvement in his civil lawsuit, the Court brought with it to these criminal proceedings "intimate knowledge" of his "medical, financial, criminal, and personal history." (2d Mot. 2.) The Court's subsequent

9

involvement in this case, he claims, "present[ed] a plausible channel through which a substantive amount of personal knowledge regarding Mr. Lynch's past interactions with regulatory and judicial authorities could have been transferred into the current proceeding." (Id. at 10.) But again, Lynch does not explain what information the Court supposedly gleaned from the civil lawsuit other than the damages claimed. (Id. at 6). Nor does he plausibly explain why that information would render the Court biased against him or how it could have "undermin[ed] the integrity of the judicial process" or "compromis[ed] [his] right to a fair trial."[13] (Id. at 5.) Nor does he explain how any such "personal, financial, medical, and criminal history" information differs from that which the Court would have received in the ordinary course in the form of a Presentence Investigation Report. Instead, the obscure suggestion that certain "overlaps" between the two cases "directly impinge upon the factual matrix upon which Mr. Lynch's guilty plea was predicated" does little to carry his stringent burden here. (Id. at 5-6.)

IV. Conclusion

A clear-eyed assessment of Lynch's motion reveals little more than buyer's remorse. Indeed, Lynch readily acknowledges that at the time he entered his plea, he "believed it to be in his best interest" (2d Mot. 1) only to reach a different conclusion months later. But the reasons he cites for this reversal are not "fair and just" within the meaning of Rule 11; they instead fall in the "change of heart" category, which is decidedly not a basis for withdrawal. See Jones v. United States, No. 13-CV-892 (BMC), 2013 WL 1091682, at *4 (E.D.N.Y. Mar. 15, 2013) (collecting cases).

It is no coincidence that each source of alleged bias identified in Lynch's motion is a matter of public record that was available to Lynch and his counsel long before, and throughout, these proceedings. Contrary to his claim that "new evidence ha[d] come to light," it is apparent that Lynch scoured sometimes decade-old public-source reporting in an attempt to avoid the consequences of the choice he knowingly and voluntarily made after the trial against him had begun. Such a "strategic maneuver" is plainly impermissible; a plea withdrawal is not available to the defendant who simply "believes that he made a bad choice in pleading guilty." Rosen, 409 F.3d at 547.

---

[13] Notably, Lynch does not dispute that he did, in fact, receive a fair trial. The record is bereft of any example of the Court expressing outward or implicit bias against Lynch, and his motion identifies none. On the contrary, the Court denied the government's effort to introduce Lynch's prior criminal convictions at trial, finding that such evidence unduly risked the very prejudice Lynch now claims the Court secretly harbored. And although the Court denied Lynch's effort to partially dismiss the indictment, even a favorable ruling on that motion would have left intact the false statement charge to which Lynch ultimately pled guilty.

10

Based on the foregoing, the portion of defendant Rickey Lynch's September 28, 2023, motion that seeks to withdraw his guilty plea should be denied, and this matter should proceed to sentencing as scheduled.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/_____
      Anthony Bagnuola
      James R. Simmons
      Assistant U.S. Attorneys

cc:   Clerk of Court (GRB) (via ECF and e-mail)
     Counsel of Record (via ECF and e-mail)